VICTOR D. SJOBERG *vs.* P. E. HARDING CONSTRUCTION CO.

JUNE 29, 1914.

PRESENT: Johnson, C. J., Parkhurst, Sweetland, Vincent, and Baker, JJ.

(1)  *Master and Servant.   Proper Appliances.   Assumed Risk.   Contributory Negligence.*

Plaintiff had been employed by defendant for about three weeks prior to the accident, working as a carpenter in an open lot near a building in process of construction. He was directed by defendant's superintendent to go upon the roof of the building, and to do so he was obliged to pass over a "run" placed on the girders, to a platform consisting of three planks laid side to side across two girders and over an open space. He was then obliged to go up a ladder the foot of which was placed in the lip of a girder which was not a part of the permanent construction of the floor, but which was laid across the girders. The ladder was further held securely by being tied with a rope to the steel framework at the roof. Plaintiff once left his work on the roof, came down the ladder and across the platform and then returned to the roof, but on again coming down in stepping from the ladder to the platform the plank on which he stepped became displaced from the girders throwing plaintiff into the cellar.

*Held,* that the questions of assumption of risk and of contributory negligence by plaintiff were properly left to the jury.

*Held,* further, that there was no duty of the plaintiff requiring him to inspect the platform, and in the absence of any reason to the contrary he had the right to assume that it was properly constructed, in what was according to some of the evidence the usual manner, and he was not as a matter of law guilty of contributory negligence if he came down the ladder and upon the platform according to the usual manner of workmen.

*(2)   Master and Servant.   Assumed Risks.*

Where a floor frame was fully disclosed to view and it was apparent that the planks of a platform did not rest upon three floor girders, and were not long enough to do so, a servant assumed the risk arising from using a platform which rested on two girders only.

*(3)   Master and Servant.   Temporary Structures.*

In a personal injury action the question was for the jury whether a platform was or not one built under the direction of the master's representative and furnished to the servant and his fellow workmen as a completed structure in a sense permanent, to be used by them in going to and from their work, taking the case out of the rule that when a structure is temporary and its erection merely a detail of the work that the servants are to perform, the master has discharged his duty when he provides suitable material for the construction and has used reasonable care in the selection of those to do the work.

*(4) Master and Servant.   Constructive Notice.*

Where the evidence showed that the representative of the master in charge of the work, passed over a platform frequently before the accident, it is a question for the jury whether the master if it did not have actual notice of the manner in which the platform was constructed, did not have constructive notice of its dangerous condition before the servant was set at work by such representative in a place that required him to use the platform.

TRESPASS ON THE CASE for negligence. Heard on exception of defendant and overruled.

SWEETLAND, J.   This is an action of trespass on the case to recover damages for personal injuries alleged to have been received through the negligence of the defendant.

The case was tried before a justice of the Superior Court sitting with a jury and resulted in a verdict for the plaintiff. At the close of the evidence the defendant moved that said justice direct a verdict in its favor.   The justice denied said motion.   The case is before us upon the defendant's exception to said ruling.

It appears from the transcript of evidence that on August 5th, 1912, the day on which said injuries were received, the defendant, as a contractor, was constructing in the city of Providence, a steel-frame building having brick walls, which building was to be about twenty-five feet in height when completed; that the plaintiff, as a carpenter, was an employee of the defendant working upon said building; that the brick walls of the building had been nearly completed, and the interior steel frame, including the framework of the main floor, was in place and bolted together.   The framework of the main floor consisted of steel girders and cross girders with open spaces, between the cross girders.   In the evidence, these open spaces are called bays and according to the testimony of some witnesses were about ten feet across.   The permanent floor was to be of concrete, but had not been laid on said August 5th.   The plaintiff had been employed by the defendant for about three weeks previous to said day and had been working in an open lot near said building making wooden frames or forms to be used in the concrete construction about the building.   George D. Miller was the defendant's superintendent having full charge of the work.   On the day in question at about half after ten o'clock in the forenoon Mr. Miller directed the plaintiff to go to work upon the roof. To get to the roof the plaintiff was obliged to pass over a so-called run or way, placed upon the steel girders of the main floor, to a platform consisting of three planks laid side to side across two steel floor girders and over one open space or bay.   The plaintiff was then obliged to go up a ladder to the roof.   The foot of said ladder was placed in the lip of a steel girder, which was not a part of the permanent construction of the floor, but was laid across the steel floor girders.   The ladder was further held securely by being tied with a rope to the steel framework at the roof.   Before noon the plaintiff left his work on the roof, came down said ladder and across the platform and then returned to the roof in safety.   At twelve o'clock noon the plaintiff came down the ladder again; and, when he stepped from the ladder to the platform, the

plank on which he stepped in some manner became displaced from the girders, on which it had rested; the plank and the plaintiff fell into the cellar; and the plaintiff was severely injured.

The defendant based its motion for the direction of a verdict in its favor upon the claim that the evidence showed that the plaintiff had passed over the platform three times before the accident, must have seen the manner in which the platform was constructed and hence the plaintiff in using the platform had assumed the risk of any displacement of the planks; also that according to the testimony the plaintiff was plainly guilty of contributory negligence in stepping from the ladder to the platform without first satisfying himself that the planks were securely placed upon the girders; and further that the evidence failed to disclose any negligence on the part of the defendant.

(1)    We think that the questions of the assumption of risk by the plaintiff and of the plaintiff's contributory negligence properly were submitted to the jury. According to the testimony of a number of witnesses, a platform, like the one in question, is usually secured to the beams beneath in such a manner that the platform and the planks composing it will not become displaced by the use of the platform. This construction on the underside of the platform cannot be seen by a person walking over it. There was no duty of the plaintiff which required him to inspect the platform before using it. In the absence of any reason for thinking the contrary he had a right to assume that the platform was properly constructed in what some of the witnesses testify was the usual manner. The plaintiff and other workmen who used the platform before said accident testified that the platform appeared to be secure and safe to use. The plaintiff cannot be held in law to have assumed the risk of a defect of which he was ignorant, or of which he would not become aware by the exercise of ordinary care. There was testimony from which the jury properly might find that the plaintiff had no reason to suspect that the platform was not securely

constructed.   It therefore cannot be held as a matter of law that the plaintiff was guilty of contributory negligence if he came down the ladder and stepped upon the platform as workmen usually do when they step from a ladder to a platform, the security of which they have no reason to question.   The plaintiff testified that he came down the ladder in the ordinary manner, facing the ladder and stepping from rung to rung and from the lowest rung to the platform without making an examination as to the condition of each rung or an examination of the platform; and that this is in accordance with the ordinary custom of workmen.

(2)   The negligence of the defendant, which the plaintiff alleges, is that the platform was improperly and carelessly constructed because made of planks which were not long enough to cover two open bays and rest on three floor girders, and also because the platform was not securely fastened to the girders on which it rested.   The first of these alleged grounds of negligence may be disregarded.   The floor frame was fully disclosed to view, and it was perfectly apparent, upon a superficial glance, that the planks of this platform did not rest upon three floor girders and that they were not long enough to do so.   The plaintiff must be held to have assumed the risk arising from using a platform which rested on two girders only.

(3)   In support of his other alleged ground of negligence the plaintiff introduced the testimony of several witnesses, who were carpenters, to the effect that it was customary to securely fasten such a platform as the one in question to the iron girders by construction on the underside of the platform; that, in circumstances such as existed at this building, a platform was unsafe which was not so secured; and that said platform was used by twenty-five or thirty workmen as a means of reaching said ladder; building material was carried over it and placed upon it; and in such use, unless the planks were secured, they were liable to become misplaced and create a dangerous situation.   As to this ground the defendant urged in support of its motion that it was not liable, and

relied upon a principle, enunciated in a long line of cases, the authority of which cannot be questioned. The general rule is that the master shall furnish to the servant reasonably safe appliances and a reasonably safe place to work; and that he is liable for the negligent performance of this duty, although he delegates it to another; yet the rule is equally well established that when an appliance or a structure is not permanent and its erection and operation is a mere detail of the work his servants are employed to perform, the master has discharged his duty towards his workmen when he has provided suitable material for the construction of the appliance or the structure and has used reasonable care in the selection of competent servants to do the work; and that the master, in such circumstances will not be held responsible for injury to one of his servants occasioned by a defect in such appliance or structure arising from the negligence of a competent co-employee of the injured servant. This, which may be regarded as an exception to the general rule as to the master's obligation, has particular application to circumstances where the appliance is portable or the structure is necessarily changing from time to time as the work progresses, and the erection, removal, adjustment, readjustment and change, clearly are necessary details of the work which the servants are doing. It has been followed frequently in cases involving injury to carpenters, painters, masons and other structural workers, caused by defects in temporary stagings and scaffoldings erected by their fellow workmen as places on which to stand and do their work. This court has applied the principle in *Laporte* v. *Cook*, 22 R. I. 554, which case involved the constantly changing conditions which arise during the construction of a sewer; and has held that the use and application of materials furnished by the master suitable for sheathing a sewer trench formed part of the duty of the workmen "And if their failure to sheath the sides of the trench was negligence, it was negligence of fellow servants of the plaintiff, for which the defendant is not liable."

Although generally the master is not responsible for defects in temporary stagings, for the making of which he had furnished suitable material and competent workmen, yet the fact that a servant is injured through a defect in such a staging is not conclusive of the master's freedom from liability.   For if the master undertakes to erect the staging himself and it is built under his direction, or if he furnishes it to the workmen for use as a completed structure he is responsible for its safety.   Also if the master has actual notice of a defect in a temporary staging, which later causes injury to one of his workmen, who in the exercise of due care is ignorant of it, which defect is due to the negligence of a fellow servant of said workman, or if the circumstances are such that the master should be held to have constructive notice of the danger, and if the master neglects to remedy the defect and permits the workman to continue to use the staging without warning of the danger, then the master's negligence, subsequent to that of the fellow workman of the one injured, must be held to be the proximate cause of the accident and the master will not be permitted to escape liability.

It appears from the testimony that the placing of the ladder and the platform in position was not an incident of any particular work on the building; but that when, in the progress of the work, it became necessary for carpenters and other workmen to go upon the roof and to carry materials there, the ladder was placed and the platform was laid.   The only testimony in the case which states how said platform came to be built is that of the defendant's superintendent, Mr. Miller, as follows:   71 Q.   "How did that ladder and planks happen to be put in place there?"   A.   "I told the men to put it up so to get to the roof; the only way we had to get up," and again, 74 Q.   "And what did you tell the men whom you had do that work?"   A.   "Told them to put a ladder up there so they could get up on the roof."   75 Q.   "And what about the platform?"   A.   "Put a plank there for them to land on, step on when they came down."

The superintendent is unable to state whom he directed to place the ladder and the platform in position and will not deny that it may have been an unskilled Italian laborer whom he ordered to construct the platform.  According to the testimony the platform and ladder had been used in that place for a day or two before the day of the accident and continued to be used for a week, at least, afterwards.  These facts present questions to go to the jury, whether this platform was or not one built under the direction of the defendant's representative and furnished to the plaintiff and his fellow workmen as a completed structure, in a sense permanent, to be used by them in going to and from their work upon the roof.  It also appears that the defendant's representative, Mr. Miller, was about all parts of the building personally superintending the work and directing the workmen.  He gives it as his opinion that he passed over this platform fifty times  before the accident.  This raises the question to be submitted to the jury as to whether the defendant, if it did not have actual notice of the manner in which the platform was constructed, in the circumstances of the case, did have constructive notice of its dangerous condition, before the superintendent set the plaintiff at work in a place that required him to use the platform.

The evidence, therefore, presented fair questions to be submitted to the jury as to whether the platform was reasonably safe for the use to which it was to be put; whether the plaintiff should be held to have assumed the risk of any defect in its construction; whether he was guilty of contributory negligence in his manner of using it; whether the defendant had undertaken to construct the platform and furnished it to the plaintiff as a completed structure; and whether the defendant had notice of the condition of the platform before he directed the plaintiff to use it.

The defendant's motion for the direction of a verdict in its favor was properly denied.  The defendant's exception is overruled.  The case is remitted to the Superior Court for the entry of judgment on the verdict.

*John P. Brennan*, for plaintiff.

*Boss and Barnefield*, for defendant.

R. I. HOSPITAL TRUST CO., Trustee vs. ELISHA H. RHODES
et als., Assessors.

JUNE 30, 1914.

PRESENT:   Johnson, C. J., Parkhurst, Sweetland, Vincent, and Baker, JJ.

(1) Taxation. "Corporate Excess." Corporations. "Carrying on Business."

Pub. Laws, 1912, cap. 769, § 20 provides "The owner of shares of stock or of bonds or debentures of any corporation liable to a tax upon its corporate excess under the foregoing provisions shall be exempt from taxation in this State thereon" and Section 39 par (8) provides that "no person, co-partnership or corporation shall be taxed for shares of stock held in, or for bonds or debentures of, any corporation liable under the laws of this State to a tax upon the corporate excess of such corporation."

Section 9 of the act specifies the corporations liable to a tax upon their corporate excess. "Taxation of Manufacturing, Mercantile and Miscellaneous Corporations." "Every corporation and joint stock company or association wherever incorporated, carrying on business for profit in this State    .   .   .   in addition to taxes on its real estate and tangible personal property locally or otherwise assessed, shall pay an annual tax to the State upon the value of that portion of its intangible property hereinafter called its corporate excess."

The X Co. was incorporated under the laws of New Jersey and its certificate of incorporation provided that "a part of the business of said company is to be conducted and carried on beyond the limits of the state of New Jersey (naming such places, including the State of Rhode Island) and the principal office or place of business of said company out of this State is to be situated in the City of Providence."    Among the enumerated powers of the company were these "to purchase, hold, use, dispose of, and sell the securities of any government or of any railway or other corporation, private, public or municipal, whether such securities shall be bonds, mortgages, debentures, notes or shares of capital stock and to exercise all the rights of stockholders as to such capital stock    .   .   .   to borrow money with or without security and to pledge or mortgage if necessary its franchises and property of every kind whatsoever; by and with the authority of the directors to endorse or guarantee the payment of the principal or interest or both of and upon bonds, notes or other obligations of any person or persons, firm or corporation."

The capital stock of the X Co. was $8,000,000 and it owned all the stock of three companies operating street railways of a total par value of $14,500,000.

These three railway companies were local corporations owning street railway franchises and properties within this State, which were leased to the Y Co. as an operating company, which in addition to other charges paid as rent varying percentages on the capital stock of the three companies. These sums were paid to the X Co.   The X Co. never owned any property except in this State or in any corporation owning property outside of this State.

A majority of the directors, and all of the officers resided in this State.   The stockholders meeting was held in New Jersey as required by the law of that state.   Records of stock transfers were kept in both states.

Directors' meetings were held both in this State and in New York.   The deposits were kept in this State and dividend checks sent from here, where the books were also kept.   The company had no office in any other state. The signing and issuance of stock certificates took place here.   The X Co. neither bought nor sold any stock in the year 1912, nor issued any of its own stock.

*Held*, that the X Co. was a corporation "carrying on business for profit in this State" in the year 1912 within the meaning of the Tax Act of 1912, since its activities constituted the exercise of one of the functions which it was expressly created to perform, and the acts performed in this State being the only business undertaken by it anywhere it was liable to taxation under the provisions of Sections 9 to 20 of said act and the petitioner as a holder of the shares of the capital stock of the X Co. was exempt from taxation thereon.

*(2)   Taxation.   "Corporate Excess."   Corporations.   "Carrying on Business."*

"Corporate excess" as used in the Tax Act of 1912 is *property*, peculiar to and belonging only to corporations and joint stock companies or associations. The general classification of corporations liable to this tax is effected by the use of the language "every corporation   .   .   .   carrying on business for profit in this State," excepting various banking institutions and public service corporations, otherwise taxed.

If a corporation belongs to this class it is not material if it shall appear that it has no "corporate excess" as it is the *liability* to a tax upon "corporate excess" which exempts the owner of shares of its corporate stock from taxation thereon.

*(3)   Corporations.   "Carrying on Business."*

A corporation is "carrying on business" in a particular locality if it is doing some of the work or is exercising some of the functions for which it was created; but transactions collateral thereto and incidental only, although they may be business, are not the business referred to in the expression.

*(4)   Taxation.   Holding Companies.   "Carrying on Business for Profit."*

The provisions of Section 11 of the Tax Act, paragraph (2) providing for the method of ascertaining the "corporate excess" "of corporations deriving their profits principally from the *holding* or sale of intangible property," indicate that corporations of this character are to be included as "carrying on business for profit."

PETITION for relief from assessment.   Heard on exception of petitioner and sustained.

BAKER, J.   This is a petition for relief from an assessment made by the assessors of taxes of the City of Providence.

Jury trial was waived, and the case was tried October 15, 1913, before a justice of the Superior Court, who denied the prayer of the petition. The petitioner excepted to said decision and afterwards duly took the steps necessary to bring the matter before this court on its bill of exceptions.

The petitioner asks for relief from a tax which it, as trustee under the will of Walter A. Peck, paid under protest October 18, 1912, on three hundred and fifty shares of the capital stock of the United Traction and Electric Co.

The assessors assessed the petitioner on account of these shares of stock on a valuation of $37,012, at the rate of four dollars a thousand. The United Traction and Electric Co. in 1912 made the return required of corporations liable to a tax upon their corporate excess. The petitioner claims that it is entitled to exemption from taxation on these shares of stock under the provisions of the tax act of 1912. Section 20 of said act (Chapter 769, Pub. Laws, 1912) provides that: "The owner of shares of stock or of bonds or of debentures of any corporation liable to a tax upon its corporate excess under the foregoing provisions shall be exempt from taxation in this State thereon;" and Section 39 of said Chapter, paragraph "eighth" provides that "no person, co-partnership or corporation shall be taxed for shares of stock held in, or for bonds or debentures of, any corporation liable under the laws of this State to a tax upon the corporate excess of such corporation." Corporations liable to a tax upon its corporate excess are pointed out in Section 9 of said tax act, which section is preceded by the caption as part of the act: "Taxation of Manufacturing, Mercantile and Miscellaneous Corporations." So much of said Section 9 as shows the basis for the claim of exemption from taxation is as follows: "Section 9. Every corporation and joint stock company or association, wherever incorporated, carrying on business for profit in this State, all hereinafter referred to under the term 'corporation'" . . . "in addition to taxes on its real estate and tangible personal property locally or otherwise assessed, shall pay an annual tax to the State upon the value

of that portion of its intangible property hereinafter called its corporate excess.''

The meaning of the expression ''corporate excess'' and the method of determining its value are set forth in said tax act, but their consideration is not involved in the present inquiry.

The parties agree that the sole issue or question in this case is whether or not the United Traction and Electric Co. was during the year 1912 a corporation ''carrying on business for profit in this State'' within the meaning of said tax act of 1912.

It is also agreed that the United Traction and Electric Co. is a corporation and that it was incorporated in New Jersey, in May, 1893.

(1)     Article second of its certificate of incorporation provides that ''a part of the business of said company is to be conducted and carried on beyond the limits of the State of New Jersey and the places where such part of its business is to be conducted and carried on are the District of Columbia, and States of New York, Connecticut, Rhode Island and Massachusetts, and the principal office or place of business of said company out of this State is to be situated in the City of Providence, in the State of Rhode Island. ''

Article third specifies and enumerates the objects for which the company was formed.     These objects are numerous and the company's powers are broad and comprehensive.

Among the enumerated objects for which it is authorized to carry on business are these:   ''to purchase, hold, use, dispose of and sell the securities of any government or of any railway or other corporation, private, public or municipal, whether such securities shall be bonds, mortgages, debentures, notes or shares of capital stock and to exercise all the rights of stockholders as to such capital stock,''  .  .  .  ''to borrow money with or without security and to pledge or mortgage, if necessary, its franchises and property of every kind whatsoever; by and with the authority of the board of directors to endorse or guarantee the payment of the principal or interest or both, of and upon bonds, notes or other obliga-

tions of any person or persons, firm or firms, corporation or corporations."

The capital stock of the United Traction and Electric Company is eight million dollars, its bonded indebtedness is nine million dollars.  It owns all the capital stock of the Union Railroad Company, the par value of which is nine million dollars, of the Pawtucket Street Railway Company, the par value of which is five hundred thousand dollars, and the Rhode Island Suburban Railway Company, the par value of which is five million dollars.  This ownership has existed for several years.  The traction company neither bought nor sold any stock in 1912.

These three railway companies are local corporations, owning street railway franchises and properties within this State which are leased to the Rhode Island Company as an operating company, which in addition to other specified charges pays as rent eight per cent. on the capital stock of the Union Railroad Company, or seven hundred and twenty thousand dollars; six per cent. on the capital stock of the Pawtucket Street Railway Company, or thirty thousand dollars, and two per cent. on the capital stock of the Rhode Island Suburban Railway Company, or one hundred thousand dollars, making eight hundred and fifty thousand dollars in the aggregate.  These sums are paid directly to the United Traction and Electric Company.  It received annually in addition from the Rhode Island Company, as part of said rent, about eleven thousand dollars to cover the New Jersey corporation tax against the traction company, the salary of the treasurer of the latter company and certain other irregular and incidental expenses for clerical services, directors' fees and the like, so that the amount of money annually received and handled by the traction company is practically eight hundred and sixty-one thousand dollars, eight hundred and fifty thousand dollars of which is income. This company has never owned any property except in Rhode Island or in any corporation owning property outside of this State.  The company has a board of seven directors.  In the

early part of 1912 five of the seven directors resided in Rhode Island, including the president, vice president, secretary and treasurer, the last two offices being filled by Mr. Cornelius S. Sweetland; of the other two directors, one resided in New Jersey, the law of that state requiring it, the other resided in New York. During the year 1912 one of the directors residing in this State resigned and the vacancy was filled by a resident of Connecticut. The stockholders' meeting was held in New Jersey, as required by the law of that state. The company had a corporate agent in Jersey City, namely, The Corporation Trust Company. Records of transfer of stock were kept both in Providence and Jersey City. The Corporation Trust Company attended to this in Jersey City and kept the traction company posted on legislation, for which services The Corporation Trust Company was paid a general fee each year. The directors' meetings were held some in the city of New York, the others in Providence.

The foregoing statement includes all of the acts and activities of the traction company performed outside of Rhode Island. The dividends and said additional sum of eleven thousand dollars, paid as rent as aforesaid, are paid to the traction company in Rhode Island and are deposited in Rhode Island banking institutions. The checks for the payment of dividends on the capital stock of the traction company are drawn by the treasurer in Providence against these deposits and sent from there to its eleven or twelve hundred stockholders. The books of the company are kept in Providence and notices of stockholders' meetings are sent from there. The company had no office in Providence for 1912 for which it paid any rent. Its office was in practice where the secretary and treasurer had his office. The company had no office in any other state. The treasurer is the only salaried official. It also appears that the signing and issuance of stock certificates take place in Providence, as also did the act of signing as guarantor of the registered bonds of the Rhode Island Suburban Company, which are guaranteed by the traction company, although it does not

appear that any acts of that nature were performed in 1912. There also is evidence that the stock of the Union Railroad Company and of the Pawtucket Street Railway Company was pledged or mortgaged to the Central Trust Company of New York as trustee as security for the holders of the bonds of the traction company and that the Union Railroad Company, prior to its leasing of its property to the Rhode Island Company, had issued bonds and given a mortgage on its property to a local trust company to secure their payment. It is stated that Mr. Sweetland, as treasurer of the traction company, in 1912, in order to protect the bondholders of the traction company was compelled to have interviews with various persons and to exercise supervision of certain proceedings for the extension of the bonds of the Union Railroad Company.  At any rate, the foregoing statement includes in substance all the acts and activities of the traction company.  There is no controversy, however, as to the facts in the case.  The question, therefore, restated, is whether or not the traction company, admitting its acts and activities to be as above stated, was a corporation "carrying on business for profit in this State" within the meaning of the Tax Act of 1912.

It is obvious that the question may be narrowed.  As already stated, it is conceded that the traction company is a corporation.  It is plain also that whatever the company did in 1912, whether much or little, was almost entirely done in this State; and it is certainly idle to suggest that the activities of the company by whatever name they may be characterized were not carried on "for profit."  The stockholders received eight hundred and fifty thousand dollars a year on its invested capital and the only reasonable inference is that they were maintaining the corporation and carrying on its work for the "profit" or gain afforded thereby and not for pleasure or charity.  By the terms of the articles of agreement on which the certificate of incorporation was issued "the objects for which the company is formed and the nature of business to be transacted by it" expressly include the pur-

chase and holding of shares of capital stock, that is, the incorporators at the beginning of their enterprise described what the traction company has since done, as the transacting of business and such business as one of the purposes for which the corporation was formed.   But of course their definition of the term "business" is not decisive of the issue now raised. The question for consideration, therefore, as narrowed, is— Do the acts and activities of the traction company carried on by it in 1912 in this State constitute the "carrying on business" within the meaning of the Tax Act of 1912?

And first, what is meant by the term "business?"  *In re The Alabama and Chattanooga R. R. Co.*, 9 Blatchf. 390, 397, Woodruff, J., says:   "In its broadest sense, the term 'business' includes nearly all the affairs in which either an individual or a corporation can be actors.   Indulgence in pleasure, participation in domestic enjoyment, and engagement in the offices of merely personal religion, may be exceptions, in the case of an individual.   But the employment of means to secure or provide for these would, to him, be business; and, to a corporation, these exceptions can have no application.   The conduct of any and all of the affairs of a corporation is business."   In this broad sense it would not seem to accord with the facts to say that the said traction company is not "carrying on business."   But the expression is no doubt frequently employed with a somewhat restricted meaning varying in this particular under differing conditions.

In *People* v. *The Commissioners of Taxes*, 23 N. Y. 242, 244, after defining business thus:  "The word 'business' embraces everything about which a person can be employed," the court goes on to say:   "No conclusion can be arrived at in this case by following out the precise lexicographical meaning of these terms.   The statute is to be interpreted, therefore, by the light to be obtained from its general scope and tenor; from other statutes *in pari materia* and from a consideration of the evils and abuses at which it was aimed."

It is generally understood that the Tax Act of 1912 was the result of a somewhat prolonged investigation and study of the subject of taxation by a commission appointed for that purpose and of a consideration of its recommendations by the General Assembly. Its aim is to effect a more scientific, complete and equitable system of taxation in this State than hitherto prevailed. The portion of the act now considered is new legislation. It singles out corporations and joint stock companies and selects that part of their intangible property named and defined in the act as "corporate excess" and imposes a special tax thereon at a flat rate established by statute, which tax is paid directly to the State Treasurer. This expression "corporate excess" is in our law a new designation and classification of property, but it is in express terms *property* and as its name implies a kind of property peculiar to and belonging only to corporations and joint stock companies or associations. The general classification of corporations liable to this tax is effected by the use of the language "every corporation . . . carrying on business for profit in this State." From this general classification trust companies, banks, banking associations and public service corporations are excepted for various reasons, chiefly because they are taxed by other methods, some of them by taxes on their business receipts rather than on their property. But these exceptions do not affect the purpose of the general classification. The classification points out and includes all the corporations, not especially excepted, liable to taxation in this way: if a corporation belongs to the class, it is not material if it shall appear that it has no "corporate excess," as it is the *liability* to a tax upon "corporate excess," which exempts the owner of shares of its corporate stock from taxation thereon.

By implication, in addition to the special exceptions referred to, all corporations not "carrying on business for profit in the state" escape liability for taxation for "corporate excess." This expression "carrying on business" and the similar one "doing business" have been frequently considered

by the courts, and especially in relation to corporate business. It is said that about the time of the adoption of the Federal Constitution there were only six corporations doing business in the United States and that in 1910 nearly two hundred and sixty-two thousand five hundred corporations made returns under the corporation tax law of 1909. Their enormous growth in recent years, not only in number, but in magnitude, with their widely-extended and far reaching business interests, with their large parent plants in one state, with their subsidiary plants and branch offices and numerous agents in other states, has been productive of many very important and difficult legal questions. Many of these cases have arisen in the attempt to enforce tax acts, particularly questions as to whether a foreign corporation is taxable and to what extent when the "carrying on business" or the "doing business" is made the test of taxability. These cases have often involved the question of double taxation when the business activities of a corporation were maintained in more than one state. In many such cases the courts in defining "carrying on business" or "doing business" have made a clear distinction between those things which constitute the real design and purpose of a corporation and the transactions which are only collateral thereto or incidental, and have held that "to constitute doing business within the meaning of such statutes there must be a doing of some of the works or an exercise of some of the functions for which the corporation was created." 5 Thomp. Corp. § 6670, p. 1459. This distinction is discussed in an interesting and instructive manner *In re The Alabama and Chattanooga R. R. Co., supra.* This case arose under the bankruptcy law of 1867. A railroad corporation created by the laws of the State of Alabama and operating a railroad in that state and maintaining an office in the City of New York was sought to be adjudged an involuntary bankrupt in the district court for the southern district of New York. The law gave jurisdiction when the debtor had "resided or carried on business for six months" in the judicial district. On page 397, after defining business

as above quoted, the court says: "Does, then, the doing of any acts whatever pertaining to the affairs of a railroad corporation constitute 'carrying on business,' in the sense of the Act? Has the term, 'carrying on business,' the same meaning as 'transacting any of its business?' If the necessities or interests of a railroad company require that an agent should be sent to a timber region to purchase or otherwise procure (*e. g.*, by cutting, sawing, &c.) materials for its superstructure, is that carrying on business there? If it send an agent or agents to a city, the centre of capital, to negotiate its bonds and raise money in aid of the construction of its road, and such agency be continued for that purpose, and for receiving subsequent remittances and making payments of interest or other indebtedness, at an office provided therefor, is that carrying on business in such city, within the meaning of the Act? I am constrained, not only by considerations already suggested, but by what, upon the words themselves, should be deemed their proper interpretation, to answer these questions in the negative. There are, in the carrying on of a business, many affairs which are merely incidental, and which may be, and often are, transacted elsewhere than at the place where the business—that which is the real design and purpose or object in view—is located; and such transactions may be of such frequent, or even daily, occurrence as to require an agency of considerable duration. It would seem to me greatly unjust and unreasonable to regard such transactions as a carrying on of business, in the sense of the law. 'Carrying on business' looks to the scheme and purpose to which such transactions tend, and not to the incidental transactions themselves. Thus, the business of a railroad corporation is, by its charter, the construction, maintenance, and operation of a railroad. That is its business. In aid thereof, it may be necessary or expedient to employ agents and agencies—since it can only act by agents—in other places than those in which its business of constructing, maintaining and operating the road can be done. But the transactions of such agents are only collateral

or incidental.  They do not, in a just sense, constitute the business of the railroad company."

See, also, *Honeyman* v. *Colorado Fuel & Iron Co.*, 133 Fed. Rep. 96; *People* v. *Feitner*, 77 App. Div. N. Y. 189; *Pavilion Co.* v. *Hamilton*, 15 Pa. Sup. Ct. 389; *Berger* v. *Pennsylvania R..R. Co.*, 27 R. I. 583.

(3)   It may be accepted, therefore, that a corporation is "carrying on business" in a particular locality if it is doing some of the work or is exercising some of the functions for which it was created; but transactions collateral thereto and incidental only, although they may be business, are not the business referred to in the expression now the subject of interpretation.

In *People* v. *Roberts*, 154 N. Y. 1, the facts were very similar to those in the case at bar.  In that case The Chicago Junction Railways and Union Stock Yards Company, a foreign corporation, as relator, sought relief from taxation under the laws of the State of New York.  The court states the facts and the law as follows:.  "The jurisdiction to tax foreign corporations under Chapter 542 of the Laws of 1880, as amended by Chapter 501 of the Laws of 1885, and the subsequent amendments, depends upon the existence of two concurring conditions, namely, that the corporation sought to be taxed shall be 'doing business' in this state, and, second, that its capital or some portion thereof shall have been 'employed within this state.'"   . . .

"The relator is a corporation organized under the laws of New Jersey as an investment company with a capital of $13,000,000, and is managed by a board of ten directors, two of whom only are residents of the state. of New York.  It has an office in Jersey City, where meetings for the election of directors are annually held, and an office in the city of New York."  . . .  "The company seems to have been organized for the purpose of investing its capital in the purchase of the stock and bonds of the Union Stock Yard and Transit Company, an Illinois corporation, and its whole capital has been invested in the stock and bonds of that corporation."  . . .

"The relator's whole income is derived from its investment in the Chicago company. The entire business of that company is done at Chicago, and its dividends are declared and paid in that city. The dividends and income of the relator, arising from the investment in the Illinois corporation, are applied by it to the payment of the interest and principal of its obligations, the disbursements of the New York office and in paying dividends to its own stockholders declared, from time to time, by the directors at meetings in New York. These dividend checks are drawn upon banks in the city of New York and are there mailed to its stockholders, 1,500 in number. The relator keeps its bank account in that city, composed of a portion of its dividends and income, and has an average balance of $25,000 or $30,000 to its credit, and it has constituted the Bank of Commerce its transfer agent there." The entire court held that the relator was "doing business" in New York, although on the point of employing capital there the majority held that such was not the fact.

ANDREWS, C. J., for the majority of the court said: "It may be conceded that the relator in keeping an office in the city of New York, where it received and disbursed its income derived from its investment in the Illinois corporation, depositing it in bank and drawing upon the deposit for the payment of its obligations, dividends to its shareholders and disbursements in maintaining its office, was doing a part of its appropriate function as an investment company, and that this was 'doing business within this state,' which satisfied that condition of the statute."

And VANN, J., in his dissenting opinion said on the question of the corporation's "doing business:" "It was not engaged in business in the state of New Jersey, where it was organized, for the election of directors and officers is not doing business within the meaning of the statute, but simply appointing agents to do business." . . . "Some confusion has arisen from the peculiar nature of its business, which was not that of making, buying or selling tangible things, or

lending money, or rendering services to others, but was the investment of its own capital, caring for the investment, collecting and dividing the proceeds. Thus it was, so to speak, an incorporated gentleman of leisure. While an individual who simply invests his money and collects the profits is not regarded as a business man, there is no escape from the fact that the relator was a business corporation, engaged in business in some state, and as nearly every business act that it is shown to have ever done, aside from some of the purchases of stock, was done in the state of New York, I think it was doing business in this State within the meaning of the statute.''

A material question in *Colonial Trust Co.* v. *Montello Brick Works*, 172 Fed. Rep. 310, was whether the United States Brick Co. was ''doing business'' in Pennsylvania. The case first appeared in the district court, E. D., Pennsylvania, under the title ''*In re Montello Brick Works*,'' 163 Fed. Rep. 621. The certificate of the referee in the last named case states the material facts as follows: ''The United States Brick Company was incorporated in Delaware.''   . . .

''The United States Brick Company was composed almost entirely of residents of Berks and surrounding counties in Pennsylvania, and the greater part of its stock was held by these persons.

''It has an office in Wilmington, Del., which is used, together with a large number of other Delaware corporations, only for the purpose of holding annual meetings of stockholders.

''Under its charter it purchased nearly all of the stock of the Montello Brick Works, bankrupt, and a controlling interest in the stock of several other corporations in Pennsylvania and New York.

''This was practically all of its corporate purposes that it exercised either in this State or in any other, unless loans of money, to be referred to later, were an exercise of its corporate objects and purposes.''   . . .

"Its meetings of directors were held in Philadelphia and Reading at the offices of the Montello Brick Works, the offices of the bankrupt.

"Its books were in the custody of its executive officers and clerks at said offices in Reading, Pa., and all the clerical work on these books was done there.

"It deposited its moneys in the First National and Penn National Banks and the Colonial Trust Company, all Reading banks."    .   .   .

"I find, in short, that, excepting the incorporation of the United States Brick Company, and the signing of the deed of trust by the company at Wilmington, Del., nearly all the things that the United States Brick Company did were done in Pennsylvania, and these things no more than have been hereinbefore found.

"I do not find that the United States Brick Company did anything in Pennsylvania, excepting to obtain and exercise control of certain Pennsylvania corporations, including the bankrupt, and to lend money to the corporation whose stock it owned largely or in part."

McPherson, J., in deciding the case said: "   .   .   . The brick company has an omnibus charter, under which it can do many things; but for present purposes it is enough to note that it was undoubtedly organized for the principal object of doing just what it proceeded to do, namely, to acquire the stock of the bankrupt, and to lend it money to carry on the operation of brick making under certain patents. This, in a few words, is the essential fact of the present controversy, and to state it is equivalent to drawing the conclusion.   The Supreme Court of Pennsylvania and the Court of Appeals of the Third Circuit unite in deciding that, when a foreign corporation exercises its charter powers in the state, it is 'doing business' therein, and that it cannot recover upon contracts made in the exercise of such powers, unless it has complied with the provisions of the Pennsylvania statutes concerning registration and other matters."

On appeal to the Circuit Court of Appeals, the court said, 172 Fed. 311-313: " . . . The proofs show the office of the company was in Reading, Pa. All of its directors, with the exception of a formal Delaware man, were residents of Pennsylvania. Its officers all resided at Reading, and did their official acts there; its books and bank accounts were kept there; its bonds were registered at Reading, and were payable there, the money in question was paid at Reading, and the notes executed there. Out of $300,000 of available funds the Delaware company had, about $267,000 were thus advanced by it in Pennsylvania to the Montello Brick Works and by that company used in Pennsylvania in accordance with the wishes of the Delaware company. It will thus appear this company was called into being to do local Pennsylvania work. It had no purpose to exercise its charter power elsewhere than in that state, and it made no effort or pretense so to do. Everything it did was a local act and in fulfillment of the local purpose for which it was created." . . . "It is clear that all its operations were, as they were at all times intended they should be, a doing of business in Pennsylvania. Judged from the intent of all parties concerned and finding such intent emphasized by every proven act we are clear that the undoubted purpose of every one concerned was to have this company do business in Pennsylvania."

These cases throw light on the two points whether a corporation is "carrying on business" or "doing business" and, if so, whether it is doing so in a foreign state.

See, also, the *Pennsylvania Company for Insurance on Lives* v. *Bauerle,* 143 Ill. 459; *The Farmers' Loan and Trust Co.* v. *The Lake Street El. R. Co.,* 173 Ill. 439, 456, and *R. I. Hospital Trust Co.* v. *Tax Assessors,* 25 R. I. 355, 359.

Under the caption *Flint* v. *Stone Tracy Company,* 220 U. S. 107, known as the Corporation Tax Cases, because fifteen such cases were heard together and decided by one opinion, the court very fully considered the question of what constitutes "carrying on business" or "doing of business" under

the "corporation tax" law of the United States, approved
August 5, 1909.    As is well-known this act imposes an excise
tax.    The purpose of the act is thus referred to on page 145:
"It is therefore apparent, giving all the words of the statute
effect, that the tax is imposed not upon the franchises of the
corporations irrespective of their use in business, nor upon
the property of the corporation, but upon the doing of
corporate or insurance business;" and on page 150:
"Within the category of indirect taxation, as we shall have
further occasion to show, is embraced a tax upon business
done in a corporate capacity, which is the subject-matter of
the tax imposed in the act under consideration.    The *Pollock
Case* construed the tax there levied as direct, because it was
imposed upon property simply because of its ownership.
In the present case the tax is not payable unless there be a
carrying on or doing of business in the designated capacity,
and this is made the occasion for the tax, measured by the
standard prescribed.    The difference between the acts is not
merely nominal, but rests upon substantial differences
between the mere ownership of property and the actual
doing of business in a certain way;" and on page 151 it
says:    "The tax under consideration, as we have construed
the statute, may be described as an excise upon the particular
privilege of doing business in a corporate capacity, *i. e.*, with
the advantages which arise from corporate or quasi-corporate
organization; or, when applied to insurance companies, for
doing the business of such companies."  .  .  .  "If
business is not done in the manner described in the statute,
no tax is payable."

Several real estate corporations claimed exemption from
the tax.    As to them, this is said:    "It is especially objected
that certain of the corporations whose stockholders challenge
the validity of the tax, are so-called real estate companies,
whose business is principally the holding and management
of real estate.    These cases are No. 415, *Cedar Street Com-
pany* v. *Park Realty Company;* No. 431, *Percy H. Brundage*
v. *Broadway Realty Company;* No. 443, *Phillips* v. *Fifty*

*Associates;* No. 446, *Mitchell* v. *Clark Iron Company;* No. 412, *William H. Miner* v. *Corn Exchange Bank;* and No. 457, *Cook* v. *Boston Wharf Company.*

"In No. 412, *Miner* v. *Corn Exchange Bank,* the bank occupies a building in part and rents a large part to tenants.

"Of the realty companies, the Park Realty Company was organized to 'work, develop, sell, convey, mortgage or otherwise dispose of real estate; to lease, exchange, hire or otherwise acquire property; to erect, alter or improve buildings; to conduct, operate, manage or lease hotels, apartment houses, etc.; to make and carry out contracts in the manner specified concerning buildings . . . and generally to deal in, sell, lease, exchange or otherwise deal with lands, buildings and other property, real or personal,' etc.

"At the time the bill was filed the business of the company related to the Hotel Leonori, and the bill averred that it was engaged in no other business except the management and leasing of that hotel.

"The Broadway Realty Company was formed for the purpose of owning, holding and managing real estate. It owns an office building and certain securities. The office building is let to tenants, to whom light and heat are furnished, and for whom janitor and similar services are performed.

"The Fifty Associates are operating under a charter to own real estate with power to build, improve, alter, pull down and rebuild, and to manage, exchange and dispose of the same.

"The Clark Iron Company was organized under the laws of Minnesota, owns and leases ore lands for the purpose of carrying on mining operations, and receives a royalty depending upon the quantity of ore mined.

"The Boston Wharf Company is operating under a charter authorizing it to acquire lands and flats, with their privileges and appurtenances, and to lease, manage and improve its property in whatever manner shall be deemed expedient by it, and to receive dockage and wharfage for vessels laid at its wharves.

"What we have said as to the character of the corporation tax as an excise disposes of the contention that it is direct, and therefore requiring apportionment by the Constitution. It remains to consider whether these corporations are engaged in business. 'Business' is a very comprehensive term and embraces everything about which a person can be employed. Black's Law Dict., 158, citing *People* v. *Commissioners of Taxes*, 23 N. Y. 242, 244, 'that which occupies the time, attention and labor of men for the purpose of a livelihood or profit.' Bouvier's Law Dictionary, Vol. 1, p. 273.

"We think it is clear that corporations organized for the purpose of doing business, and actually engaged in such activities as leasing property, collecting rents, managing office buildings, making investments of profits, or leasing ore lands and collecting royalties, managing wharves, dividing profits, and in some cases investing the surplus, are engaged in business within the meaning of this statute, and in the capacity necessary to make such organizations subject to the law."

We believe that these cases sufficiently indicate the proper construction of the words "carrying on business" which should be followed in the case at bar. As already stated, the traction company's acts and activities in 1912 were practically all performed in Rhode Island and they were done for profit. Do these acts and activities constitute "carrying on business?" We think they do. They constitute the exercise of one of the functions which the corporation was expressly created to perform. That, as we have found, is the test of "doing business." These activities were not collateral and incidental to a business conducted elsewhere. On the contrary what the corporation has done in this State is the only business it has undertaken anywhere. It is not important that its business activities are small so long as the business is what the corporation was created for and what it is expressly authorized to conduct. To find otherwise would be equivalent to saying

that an investment or holding company, expressly created as such, when exercising that function is not doing business. That would be contrary to the authority of the foregoing decisions. It would also be contrary to the provision of the tax act itself which in paragraph second of Section 11 provides the method of ascertaining the "corporate excess" "of corporations deriving their profits principally from the *holding* or sale of intangible property," clearly indicating that corporations of this character were to be included as "carrying on business for profit."

But certain cases have been cited by the defendants as being contrary to the view above announced, and we will consider them and indicate wherein they in our judgment are distinguishable from the case at bar.

*Zonne* v. *Minneapolis Syndicate Co.*, 220 U. S. 187, was heard with the above-mentioned corporation cases and decided the same day. Mr. Justice Day wrote the opinion in both the *Flint* and the *Zonne* case. The court says: "The case presents a peculiarity of corporate organization and purpose not involved in the case just decided. The Minneapolis Syndicate, as the allegations of the bill, admitted by the demurrer, show, was originally organized for and engaged in the business of letting stores and offices in a building owned by it, and collecting and receiving rents therefor. On the twenty-seventh of December, 1906, the corporation demised and let all of the tracts, lots and parcels of land belonging to it" . . . "for the term of 130 years, from January 1, 1907, at an annual rental of $61,000 to be paid by said lessees to said corporation. At that time the corporation caused its articles of incorporation, which had theretofore been those of a corporation organized for profit, to be so amended as to read: 'The sole purpose of the corporation shall be to hold the title to the westerly one-half of block 87 of the town of Minneapolis, now vested in the corporation, subject to a lease thereof for a term of one hundred and thirty years from January 1, 1907, and, for the convenience of its stockholders, to receive, and to distribute among them, from

time to time, the rentals that accrue under said lease, and the proceeds of any disposition of said land.'" . . . "The corporation involved in the present case, as originally organized and owning and renting an office building, was doing business within the meaning of the statute as we have construed it. Upon the record now presented we are of opinion that the Minneapolis Syndicate, after the demise of the property and reorganization of the corporation, was not engaged in doing business within the meaning of the act. It had wholly parted with control and management of the property; its sole authority was to hold the title subject to the lease for 130 years, to receive and distribute the rentals which might accrue under the terms of the lease, or the proceeds of any sale of the land if it should be sold. The corporation had practically gone out of business in connection with the property and had disqualified itself by the terms of reorganization from any activity in respect to it. We are of opinion that the corporation was not doing business in such wise as to make it subject to the tax imposed by the act of 1909."

The wholly parting with the control and management of the property and disqualification of itself by the terms of reorganization from any activity in respect to it are stated as the significant facts and reasons for finding that the corporation had practically gone out of business in connection with the property. Such facts do not exist in the case at bar. The traction company has in no particular parted with the control and management of its property, nor has it in any respect disqualified itself from exercising any of its powers or activities relative thereto, or any of its other powers. The *Zonne* case does clearly imply that the mere holding of the title to the real estate and receiving and distributing the rentals under the lease are not doing business within the meaning of the corporation tax act, although the court is apparently careful to refrain from declaring without qualification that the syndicate company was not doing business. In this case, as reported, it appears that counsel for the

defendant urged that the debates in Congress as well as the affirmative action of that body show that holding companies were entitled to be excluded from the operation of the corporation tax law. The court does not expressly find that holding companies are not taxable. But if the decision were to be so interpreted, it clearly would not be a precedent in the present case inasmuch as our statute, as already shown, clearly indicates a legislative intent to tax such companies. The case cited, for these reasons, is distinguishable from the present one.

In *McCoach* v. *Minehill Railway Co.*, 228 U. S. 295, the facts are substantially these: The Minehill Company was incorporated in 1828 for the purpose of conducting and operating a railroad. It built a railroad and operated it for many years. In 1896 it leased its entire railroad and all of its property of every description in use or adapted for use in, upon or about the railroad and also "all the rights, powers, franchises (other than the franchise of being a corporation), and privileges which may now, or at any time hereafter during the time hereby demised, be lawfully exercised or enjoyed in or about the use, management, maintenance, renewal, extension, alteration, or improvement of the demised premises or any of them" to the Philadelphia & Reading Ry. Co., for a term of nine hundred and ninety-nine years, from January 1, 1897, at a yearly rental of $252,612, that being equivalent to six per cent upon the capital stock of the Minehill Company. Thereupon the railroad and its property were turned over to the Reading Company, which has since operated it, and the Minehill Company has not carried on any business in connection with its operation. The Minehill Company maintains its corporate existence and organization by electing officers annually. It receives said yearly rental and interest on its bank deposits and maintains a contingent fund from which it receives annual sums as interest or dividends. It pays the necessary expenses incident to maintaining its offices and corporate existence, including salaries of officers and clerks. It keeps stock books

for the transfer of its stock, which is bought and sold upon the market.    The annual income from the contingent fund is about $24,000, and the annual payments for state tax about as much and its expenditures for corporate mainte-nance about $5,000.    On page 303 the court says:    "The precise question presented by the present record is whether the Minehill Company is 'doing business' in the sense in which the realty companies concerned in *Flint* v. *Stone Tracy Co.*, 220 U. S. 107, 170, were doing business, or had gone out of business in substantially the same sense that the Minne-apolis Syndicate had done so.

"From the facts as stated above it is entirely clear that the Minehill Company was not, during the years of 1909 and 1910, engaged at all in the business of maintaining or operat-ing a railroad, which was the prime object of its incorporation. This business, by the lease of 1896, it had turned over to the Reading Company.    If that lease had been made without authorization of law, it may be that for some purposes, and possibly for the present purpose, the lessee might be deemed in law the agent of the lessor; or at least the lessor held estopped to deny such agency.    But the lease was made by the express authority of the state that created the Minehill Company, conferred upon it its franchise, and imposed upon it the correlative public duties.    The effect of this legislation and of the lease made thereunder was to constitute the Reading Company the public agent for the operation of the railroad and to prevent the Minehill Company from carrying on business in respect of the maintenance and operation of the railroad so long as the lease shall continue.    And it is the Reading Company, and not the Minehill Company, that is 'doing business' as a railroad company upon the lines covered by the lease and is taxable because of it.    The Corporation Tax Law does not contemplate double taxation in respect of the same business."    .    .    .

"We conclude that the Minehill Company was not taxable with respect to the railroad business."

And the court further says: "In our opinion the mere receipt of income from the property leased (the property being used in business by the lessee and not by the lessor) and the receipt of interest and dividends from invested funds, bank balances, and the like, and the distribution thereof among the stockholders of the Minehill Company, amount to no more than receiving the ordinary fruits that arise from the ownership of property. The ground of the decision in the *Pollock Case* was that a tax upon income received from real estate and invested personal property (as distinguished from income received from the transaction of business) was in effect a direct tax upon the property itself and therefore invalid unless apportioned according to population;" and on page 308, after discussing the section of the corporation tax act providing for the including of income.from nontaxable property in order to ascertain the measure of the tax, the court says: "The distinction is between (a) the receipt of income from outside property or investments by a company that is otherwise engaged in business; in which event the investment-income may be added to the business-income in order to arrive at the measure of the tax, and (b) the receipt of income from property or investments by a company that is not engaged in business except the business of owning the property, maintaining the investments, collecting the income and dividing it among its stockholders. In the former case the tax is payable; in the latter not.

"And so, upon the whole, we think the court below correctly held that the present case is governed by *Zonne* v. *Minneapolis Syndicate*, 220 U. S. 187, and that the taxes under consideration were unlawfully imposed."

If we interpret this opinion aright it amounts (speaking broadly) to this: first, that the Minehill Company was not taxable with respect to the railroad business for which it was incorporated, inasmuch as it had transacted no such business; second, that a tax upon its income of $24,000 arising from its investments, on the authority of the *Pollock Case*, 157 U. S. 429 (the Income Tax Case), would in effect be

a direct tax upon property imposed thereon solely by reason of its ownership and therefore invalid because not apportioned according to population; and third, that the collection and distribution of rentals and income to stockholders, and the other activities of the Minehill Company as described, were not carrying on business within the meaning of the Corporation Tax Act, such activities being incidental to the ownership of property merely.

The principal point in this decision is based on the fact that the Minehill Company was not transacting the business for which it was incorporated, although that it was doing business is not denied but expressly conceded. As to this point the decision does not apply to the case at bar as the traction company is doing what it was incorporated to do. Neither is the distinction between a tax on business and property of importance here as the tax under the State Tax Act is expressly a tax on property. If the reference to the collection and distribution of income arising from investments and from the rental of the Minehill property, etc., as not constituting carrying on business under the act contains the implication that the Minehill Company had become in effect a holding company and as such not taxable, what we have already said as to the scope of our own act in this particular distinguishes the case at bar from the Minehill case. But in view of the decision as to the realty companies in the *Flint Case* it is at least questionable if such implication was intended in the *Minehill Case*. The Supreme Court up to the present time has apparently carefully refrained from declaring a holding company not taxable.

Three of the Court dissented in the *Minehill Case* on the ground that it was carrying on business and Mr. Justice Day wrote the dissenting opinion. We make extracts therefrom because they are suggestive and pertinent in some particulars in giving interpretation to our own tax act and are in general harmony with the views we have already expressed. Among other things, he says: "The amount

of business done is utterly immaterial. The doing of any business with the advantages which inhere in corporate organization brings the corporation within the terms of the act. Such was the ruling in the *Flint Case* after full consideration by this court of the terms and scope of the law. It is said, however, that this case is controlled by the ruling in the *Zonne Case* . . . It seems to me that the present case is quite unlike that one." . . . "In the present case the corporation has not disqualified itself from business activity. It maintains a considerable force in active employment and, entirely apart from the receipts from the railroad lease, so deposits and invests its funds as to create, in these days of low interest upon good investments, an annual income of over $24,000, as appears by its return. The amount derived from investments depends upon the exercise of judgment and the efficiency of management. If business includes everything that occupies the time, attention and labor of men for profit, it seems to me that these facts show that the Minehill Company is carrying on business in the present instance." . . .

I think the present case is much nearer the ruling made by this court in the *Corporation Tax Cases* in the matter of the realty companies therein involved. Take, for instance, the Park Realty Company. That corporation was organized to work, develop, sell and convey real estate; to lease, exchange, hire or otherwise acquire property; to erect, alter or improve buildings; to conduct, operate, manage or lease hotels, etc. It appeared that at the time of the imposition of the tax the sole business or property owned by the realty company was the Hotel Leonori. It was leased for 21 years, at an annual rental of $55,000. The corporation was engaged in no business, except the management and lease of that hotel property, and was in receipt of no other income than that derived from its rental, and has no assets other than that property and the income thereof. It was held to be doing business within the meaning of the act."

*State* v. *Anniston Rolling Mills*, 125 Ala. 121, is similar to the Minehall case.   The action was to recover a license tax imposed for doing business as a corporation.   The rolling mill corporation after organizing for the purpose of manufacturing and dealing in iron and iron products, leased its plant to another corporation and its only corporate acts during the year in question were the collection of rents, the payment of taxes, the rent of some of its money and collecting interest thereon, the doing all such other things as are incident to the preservation of its property and the holding of its directors' meetings.   The test under the law was whether the corporation exercised any of the functions, powers or franchises which it was intended to perform or was engaged in the transaction of the business or any part thereof which it was organized to transact.   It was held that it had not done so, and that it was not taxable.   This case is also readily distinguishable from the case at bar on grounds already indicated.

In *People* v. *Horn Silver Mining Co.*, 105 N. Y. 76, the acts and activities of the defendant company were held to constitute "doing business."   *Peterson* v. *Chicago R. I. & P. R. Co.*, 205 U. S. 364; *People* v. *American Bell Telephone Co.*, 117 N. Y. 241; *Mannington* v. *Hocking Valley R. R. Co.*, 183 Fed. 133; *Chicago Title and Trust Co.* v. *Bashford*, 120 Wis. 281, and *Toledo Traction, Light and Power Co.* v. *Smith*, 205 Fed. 643, are authorities for the doctrine that the holding by a corporation of a controlling portion or all of the capital stock of a local corporation and the exercise of the rights of a stockholder, such as voting on the stock and assenting to the adoption of regulations do not constitute doing business within the state of the local corporation.   They need no further comment.

We are of the opinion therefore that the United Traction and Electric Company was carrying on business for profit within this State in 1912 within the meaning of the tax act of 1912; that it was liable to taxation under the provisions of Sections 9 to 20 of said act and that the petitioner

as a holder of the shares of the capital stock of said traction company was exempt from taxation in this State thereon.

The exception of the petitioner is sustained; the decision of the court below is reversed and the case is remitted to the Superior Court with direction to enter judgment for the petitioner for $148.05, with interest thereon from October 18, 1912.

*Claude R. Branch, Edward P. Jastram, Edwards & Angell,* for petitioner.

*Tillinghast and Collins,* of counsel.

*Albert A. Baker,* City Solicitor, *Elmer S. Chace,* Assistant City Solicitor, for respondent.